In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2509

Cheryl A. Gile,

Plaintiff-Appellee,

v.

United Airlines, Inc.,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 94 C 1692--Rebecca R. Pallmeyer, Judge.

Argued January 18, 2000--Decided May 22, 2000

   Before Easterbrook, Kanne and Diane P. Wood, Circuit
Judges.

   Kanne, Circuit Judge.  Cheryl Gile worked eight
years for United Airlines, Inc. ("United") before
she began suffering from a cluster of
psychological disorders that made it increasingly
difficult for her to perform her job. Gile
initially had volunteered for night shift duty,
but insomnia and exhaustion from sleep
deprivation were aggravating her psychological
condition. After consultation with a
psychologist, she asked United to accommodate her
condition by reassigning her to a daytime shift,
but United refused Gile's repeated requests and
suggested that she consider quitting her job
instead. Gile sued under the Americans with
Disabilities Act of 1990 ("ADA"), secs. 42
U.S.C. 12101-12213, for United's failure to
accommodate her disability and won both
compensatory and punitive damages at trial.
United now appeals the district court's denial of
judgment as a matter of law on compensatory
damages, the jury instruction barring
consideration of mitigating measures in assessing
disability under the ADA and the denial of
judgment as a matter of law on punitive damages
under the Supreme Court's decision last term in
Kolstad v. American Dental Ass'n, 527 U.S. 526,
119 S.Ct. 2118 (1999). We affirm the judgment for
Gile but reverse the award of punitive damages.

I.  History

   In March 1984, Cheryl Gile began working for

United as a data entry operator in the air freight department at O'Hare International Airport in Chicago, Illinois. Her mother had worked eighteen years for United and recommended United as an employer, so Gile was excited about the job. Although United transferred Gile several times over the next five years between the day and night shifts, she received good performance evaluations describing her as a "valuable asset" and a "very competent, thorough and accurate employee." In January 1989, at her request, Gile received a transfer to the night shift, running from 10 p.m. to 6:30 a.m., and worked nights without complaint for several years.

However, when Gile returned to work from maternity leave in March 1992, she began feeling chronically depressed and suffered from insomnia and constant anxiety. She slept only a few hours a day, struggled to perform mundane household chores, erupted into spontaneous outbursts of crying, fell asleep while driving and felt perpetually fatigued. In June 1992, Gile initiated semi-weekly consultations about her psychological condition with Betty Orlandino, a licensed clinical social worker listed by United in its catalog of health care providers recommended to employees.

Gile told Orlandino that she had been able to sleep only a few hours a day since returning to work in March. Gile reported that she "could not function properly" and was "going crazy." Orlandino diagnosed Gile with depression and anxiety disorder because Gile was suffering from feelings of "hopelessness and helplessness" and experiencing "fatigue, irritability, distractibility, [and] difficulty concentrating." Orlandino noted that Gile's anticipatory anxiety over getting enough sleep each night and the sheer exhaustion from insomnia exacerbated Gile's condition, and she instructed Gile to seek transfer to a daytime shift. Soon afterward, Gile informed her supervisor James Kinzler that she was struggling with depression and that she needed a shift transfer. Although Kinzler testified at trial that he did not recall this meeting, Gile said Kinzler told her that he would let her know about any new openings on the day shift. Kinzler never spoke to Gile about a transfer again.

On August 28, 1992, Gile had an emotional "breakdown" at work. She started crying uncontrollably and told supervisor Frank Mancini that she thought she was losing her mind. Gile tried resting for a spell then returning to work, but Mancini allowed her to go home when that did not alleviate her anxiety attack. Gile called Orlandino immediately after arriving home and saw

Orlandino on August 31. After consulting a physician, psychologist and two psychiatric social workers, Orlandino formally recommended that Gile be placed on medical leave and given anti-depressant and anti-anxiety medication. Orlandino provided Gile a note, which Gile presented to Mancini a few days later, stating that Gile was "experiencing a depressive reaction with anxiety state" and "her present position at United and the night shift are aggravating her condition."

United's Regional Medical Director Dr. Robert McGuffin handled Gile's claim pursuant to his duties of evaluating the medical condition and work fitness of United employees at O'Hare Airport. He telephoned Orlandino, who told him that Gile's condition was directly related to Gile working the night shift. On September 22, 1992, McGuffin met with Gile but did not take her medical history or conduct a psychological examination. Gile explained her symptoms and told McGuffin that she was seeing Orlandino twice weekly for depression. McGuffin retorted that "if [she] was that unhappy, [then] why didn't [she] just resign and stay home." Gile answered that she did not want to stay home and that she wanted to work; she insisted that it "didn't matter if it was lateral, didn't matter if it was a demotion. [She] would take anything as long as [she] could be on a regular shift, a regular daytime shift." McGuffin told her to see him in a couple of weeks and terminated the fifteen-minute meeting. McGuffin approved Gile's request for medical leave but deemed Gile's condition a "nonoccupational illness."

Three days later, on September 25, 1992, Gile applied for a "competitive transfer." United regularly posted new job openings at O'Hare and invited employees to submit their resumes and most recent performance evaluations as "competitive transfer" applications for these positions. Gile applied for two non-data entry job openings, one in reservations and one in the air freight headquarters, but never heard back about her applications.

Disappointed by McGuffin's summary conclusion, Orlandino sent a letter dated September 29, 1992, to McGuffin repeating that Gile needed reassignment to the day shift because Gile's problems stemmed directly from her night shift position. The letter averred that "[a]lthough the etiology of Mrs. Gile's condition is non-occupational as to her job duties, it is directly related to the shift she had been assigned to." Therefore, the letter requested that "a change in shift be considered for Cheryl Gile." McGuffin testified at trial that he realized "there was

something wrong with [Gile] mentally" and he did not disagree with the diagnosis of depression and anxiety or "take issue" with Orlandino's assessment. Furthermore, though United challenged Orlandino's professional credentials at trial and in its appellate briefs, neither McGuffin nor any other United representative ever requested that Gile be treated or evaluated by another physician or psychologist.

When Gile saw McGuffin again on November 2, 1992, Gile reported ongoing "severe, severe depression" and again "begged him to please help [her]." Gile said that she would be happy to go back to work if he would "please just help [her] get a job that [she] would be working the day shift." McGuffin huffed that "it sounded like a personal problem . . . not an illness." McGuffin explained at trial that he did not expedite reassignment to the day shift partly because he was concerned that other employees might expect or request a transfer out of the night shift as well. He also thought that a "change in work schedule more accurately addressed personal and life and family issues rather than an illness." McGuffin took no further action other than telling Gile to seek a nonmedical transfer, which she had already tried, and issuing Gile a work release note for continued duty on the night shift.

Upon hearing McGuffin's assessment, Orlandino called McGuffin to insist that Gile's night shift assignment was a "major factor" in Gile's condition. McGuffin steadfastly disagreed and said that "if [Gile] didn't like it, she could quit." A few days later, Orlandino faxed McGuffin a letter recommending that Gile be placed on temporary disability until January when United annually rearranged work shift schedules. Gile gave McGuffin's work release note to her supervisor but explained that Orlandino had not released her to work the night shift. As a result, United placed Gile on authorized leave without pay.

United annually reshuffled its employee shift assignments and permitted employees each November to bid according to seniority for shift reassignments. By the November 1992 bidding, Gile had accrued sufficient seniority to win an evening shift, running from 2 p.m. to 10 p.m., beginning in January 1993. Gile testified that she would have been happy to work the evening shift because it was basically a daytime shift, however Gile was home on authorized leave at the time of November bidding and did not place a bid at all for the 1993 work year.

Since United had placed Gile on indefinite

authorized leave, Gile was understandably surprised when she received a termination letter from United on January 14, 1993, notifying her that United had terminated her employment for abandonment of her job. Gile contacted United for clarification, but United did not respond. Buffeted by the stress of her apparent termination, Gile's psychological condition worsened, and she began seeing psychiatrist Dr. Alan Hirsch on Orlandino's recommendation in April 1993. Hirsch examined Gile four times over the next six months and confirmed Orlandino's diagnoses of clinical depression and severe anxiety. During these sessions with Hirsch, Gile reported loss of self-esteem from her termination and explained that she had seriously contemplated suicide. Hirsch prescribed additional medication and forwarded his diagnoses to United. In addition, Orlandino continued to lobby United on several occasions, urging it to reinstate Gile and permit her to work a daytime shift. United acknowledges that daytime positions remained open throughout all the events of this case, even after November bidding closed.

After a series of persistent inquiries by Gile's lawyer, United contacted Gile on September 23, 1993, and negotiated her return to work in April 1994. At trial, United explained that it had mailed the termination letter by mistake and "unfired" Gile when it unraveled the confusion. For her part, Gile was "more than happy to come back" to United. Upon her return, Gile worked the day shift for two months while another employee was ill, then worked the evening shift after the ill employee's return. Working during the day and evening served Gile well, just as Orlandino predicted. Gile testified that "[i]t was immensely helpful to be back at work," and her condition "started to stabilize," though it did not clear up overnight.

Before her return to work, however, Gile sued United in the Northern District of Illinois on March 18, 1994, alleging that United violated the ADA in failing to accommodate reasonably her disability by transferring her out of the night shift. In its defense, United pointed to its "Reasonable Accommodation Policy," which read in pertinent part:

In keeping with its commitment to equal employment opportunity and through implementation of our Affirmative Action Plan for the Disabled, United Airlines is obligated to make reasonable accommodations whenever possible for disabled applicants and/or employees who are selected for hire, promotion, job retention or training.

By way of explanation, United has a Reasonable

Accommodation procedure applicable to employees or applicants with physical or mental work restrictions. . . .

* * * *

Regulations state: "An employer must make a reasonable accommodation to the physical and mental limitations of an employee/applicant, unless the employer can demonstrate an accommodation would impose an "undue hardship" on the Company."

* * * *

The key to this process is to identify the work restriction(s) and then establish the financial and productivity loss which may be associated with an accommodation. In some instances, these restrictions are insignificant to the performance of the job being considered. In these cases, Reasonable Accommodation is achieved with no significant financial or productivity loss.

* * * *

A.  Reasonable Accommodation--Employees (internal)

Same procedures as for new-hire accommodations. If the accommodation can be made, proceed accordingly. If the recommendation is to deny accommodation, and that decision is upheld by the Accommodations Committee, the Staff Representative-Personnel supporting the operation will work in conjunction with the employment offices to find alternative job opportunities for the employee.

At all relevant times, McGuffin and Gile's supervisors knew and understood United's reasonable accommodation policy.

  After several contentious discovery disputes during which United refused to produce a number of documents, the district court granted summary judgment in favor of United, holding that United was not required to transfer Gile as a reasonable accommodation for her disability. Gile appealed several district court discovery rulings and the grant of summary judgment, and we reversed and remanded in Gile v. United Airlines, Inc., 95 F.3d 492 (7th Cir. 1996). The case proceeded to trial on February 8, 1999, and a jury granted judgment for Gile four days later, awarding $200,000 in compensatory damages and $500,000 in punitive damages. The district court denied United's renewed motions for judgment as a matter of law, or in the alternative, a new trial, but limited Gile's total damages to $300,000 as

required under 42 U.S.C. sec. 1981a(b)(3). United now appeals the district court's denial of its motions for judgment as a matter of law regarding compensatory damages, denial of United's requested jury instruction on consideration of mitigating measures in assessing Gile's disability and denial of United's motion for judgment as a matter of law regarding punitive damages.

## II.  Analysis

### A.  Judgment as a Matter of Law on Compensatory Damages

The district court denied all three of United's motions under Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law on liability for compensatory damages, and United now appeals arguing that (1) there was no legally sufficient evidentiary basis for a reasonable jury to find that Gile was a qualified individual under the ADA; and (2) Gile was solely responsible for a breakdown in the required interactive process by failing to avail herself of the bidding procedures for an employee to request a shift transfer.

In appealing a denial of a motion for judgment as a matter of law after the jury has decided against it, United assumes a herculean burden. We reverse only if no rational jury could have found for the plaintiff, even when viewing the evidence in the light most favorable to the nonmovant. See Collins v. Kibort, 143 F.3d 331, 335 (7th Cir. 1998). Careful to avoid substituting our judgment for that of the factfinder at trial, we ascertain whether there exists sufficient evidence upon which any rational jury could reach the trial verdict. See Tincher v. Wal-Mart Stores, Inc., 118 F.3d 1125, 1129 (7th Cir. 1997). Moreover, we apply this standard stringently in discrimination cases, where witness credibility is typically crucial. See Williams v. Pharmacia, Inc., 137 F.3d 944, 948 (7th Cir. 1998). We review this question de novo. See Collins, 143 F.3d at 335.

First, United claims that the jury lacked sufficient evidentiary basis to find that Gile was a qualified individual with a disability under the ADA. Specifically, United argues that Gile did not provide the jury with a reasonable basis to find that her requested accommodation--a transfer from the night shift to a daytime shift--would have enabled her to perform the essential functions of her job. The ADA requires accommodation only for a "qualified individual with a disability" who can perform her job with or without reasonable accommodation. See Vollmert v. Wisconsin Dep't of Transp., 197 F.3d 293, 297

(7th Cir. 1999). The ADA thus mandates that an employer make reasonable accommodations only if accommodation would permit the disabled employee to perform her job, and an employer need not grant a disabled employee's request for an accommodation that would be an "inefficacious change." Vande Zande v. Wisconsin Dep't of Admin., 44 F.3d 538, 542 (7th Cir. 1995).

In Weigel v. Target Stores, 122 F.3d 461, 469 (7th Cir. 1997), we affirmed summary judgment for the defendant and held that the plaintiff failed to show that she was a qualified individual under the ADA. The plaintiff, who undisputedly could not work without accommodation, rested her claim entirely on a doctor's affidavit that "there was a good chance" that she could return to work with her requested accommodation of extended medical leave, which the employer had rejected. This bare assertion without any further explanation was "simply too conclusory and uninformative to be given any weight" because "we [were] left totally in the dark" about the bases for the doctor's opinion. Weigel, 122 F.3d at 469. The doctor indicated nothing about the plaintiff's condition, past responsivity to treatment or the reasons that Weigel's condition would improve with accommodation. Without any additional evidence that she could perform her job with reasonable accommodation, Weigel could not show that she was a qualified individual under the ADA.

Contrary to United's assertions, however, Gile presented far more credible evidence about her condition and the expected effect of a transfer to a daytime shift than the lone, conclusory affidavit presented by the plaintiff in Weigel. Unlike the plaintiff in Weigel, Gile presented an endless stream of documentation from Orlandino about her psychological symptoms and the need for a transfer to a daytime shift. Orlandino testified that Gile's anticipatory anxiety over being able to get enough sleep each night and the sheer exhaustion from insomnia exacerbated Gile's condition. She and Gile explained to McGuffin that regular daytime work would have stabilized her sleep patterns and reduced the anxiety and stress attendant to her psychological conditions. Although a shift transfer may not have cured Gile's condition altogether, a rational jury easily could conclude that a shift transfer would have alleviated her symptoms such that Gile could have performed her job. Indeed, once Gile returned to work on daytime shifts in April 1994, Gile's condition did benefit from the regular work and sleep schedule. Gile sufficiently established that she was a qualified individual with a disability who could have performed her job with reasonable accommodation.

Second, United claims that it is entitled to judgment as a matter of law because, according to United, Gile obstructed the interactive process by failing to avail herself of United's bidding and competitive transfer procedures. To begin, United mistakes Gile's obligation in the interactive process. In Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 693 (7th Cir. 1998), we presented the respective obligations of employer and disabled employee in executing the accommodation process. The employee first must start by informing the employer of her disability. See id. Gile duly notified United of her disability and requested accommodation. At that point, the ADA obligates the employer to "engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 563 (7th Cir. 1996). This step "imposes a duty upon employers to engage in a flexible, interactive process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working." Hendricks-Robinson, 154 F.3d at 693 (internal citations omitted); see also Miller v. Illinois Dep't of Corrections, 107 F.3d 483, 486-87 (7th Cir. 1997) (holding that the employer must "ascertain whether he has some job that the employee might be able to fill."). Although United argues that Gile's proposed accommodation would have been ineffective, United had the affirmative obligation to seek Gile out and work with her to craft a reasonable accommodation, if possible, that would have permitted her return to work. See Hendricks, 154 F.3d at 693; Bultemeyer v. Fort Wayne Community Sch., 100 F.3d 1281, 1286 (7th Cir. 1996).

It is here that United flunked its obligations under the ADA. In the face of Gile's repeated pleas for a shift transfer, United refused her request for a modest accommodation, then did nothing to engage with Gile in determining alternative accommodations that might permit Gile to continue working. McGuffin provided no help at all except to suggest that Gile "just resign and stay home." United's only action in the subsequent months was to terminate Gile in January--a move that United subsequently disclaimed. Unlike Weiler v. Household Finance Corp., 101 F.3d 519, 526 (7th Cir. 1996), where the plaintiff requested a transfer which would have required either creation of a new position or bumping another employee, and the defendant contacted the plaintiff about five available positions as alternative accommodations, United

made no effort to accommodate Gile.

However, United contends that it did not approach Gile and engage in the interactive process because Gile readily possessed the means to obtain reasonable accommodation by herself without United's help. United concedes that daytime and evening positions were vacant throughout the period during which Gile was requesting a transfer, but notes that Gile was entitled by seniority to an evening shift position if she had participated in United's November 1992 bidding process. United argues that Gile should have bid for a transfer in November, even though she was no longer working and was on indefinite medical leave, and she would have received the transfer that she requested. When Gile failed to bid for one of the vacant daytime positions, United claims that it could do nothing more for her. United protests that it would have constituted prohibited "affirmative action" for United to have reassigned Gile to a daytime shift outside the November bidding process, even for positions that remained open after bidding closed. We disagree.

Under the circumstances, the ADA required that United transfer Gile to a vacant daytime position. Although the ADA does not obligate employers to "bump" other employees or create new positions, sec. 12111(9) of the ADA requires an employer to reassign a disabled employee to a vacant position for which the employee is otherwise qualified. See Gile, 95 F.3d at 499; Hendricks-Robinson, 154 F.3d at 694-95; Dalton v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667, 678 (7th Cir. 1998); DePaoli v. Abbott Laboratories, 140 F.3d 668, 675 (7th Cir. 1998). The employer is obligated to "identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites" and consider "transferring the employee to any of these other jobs, including those that would represent a demotion." Dalton, 141 F.3d at 678. United is wrong to say that it constitutes "affirmative action" to reassign Gile to a vacant position for which she was entitled by seniority and which would have accommodated her disability. If United had reassigned Gile as she requested, the only preferential treatment of Gile would have been that, unlike nondisabled employees who were not on medical leave, she did not have to fulfill the technical requirement of casting her November bid.

Although the ADA does not require the employer to abandon its legitimate policies regarding job qualifications and entitlements to company transfers, United cannot seriously claim that the

procedural requirement of November bidding was too important for United to bypass when daytime positions remained vacant after the bidding process. In Hendricks-Robinson, the defendant's policy of posting job openings and insisting that disabled employees independently learn of and apply for new positions was insufficient to satisfy the employer's duty under the ADA to investigate the possibility of transferring disabled employees. Hendricks-Robinson, 154 F.3d at 694. Likewise, United failed its duty of reasonable accommodation because it took no action other than to reject Gile's request. By refusing her request and assuming no further duty to accommodate because its shift bidding process was in place, United failed its ADA obligation.

B. Jury Instruction Under Sutton

At trial, the district court instructed the jury that it should assess Gile's disability without regard to mitigating measures, namely the medications that Gile took to treat her depression and anxiety. A few months after the trial's close, the Supreme Court decided Sutton v. United Airlines, Inc., 527 U.S. 471, 119 S.Ct. 2139, 2143 (1999), and held that "the determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment." Gile admits that the jury instruction in this case was therefore improper under the Supreme Court's subsequent holding in Sutton, but explains that United could present scant evidence that this error prejudiced United. Indeed, to win a new trial based on an incorrect jury instruction, United must show both that (1) the instruction inadequately states Seventh Circuit law; and (2) the error likely confused or misled the jury causing prejudice to the appellant. See Doe v. Burnham, 6 F.3d 476, 479 (7th Cir. 1993). This is another onerous burden for United because, even if the jury instruction was patently incorrect, United still must establish that it was prejudiced by the improper instruction. See EEOC v. AIC Security Investigations, Ltd., 55 F.3d 1276, 1283 (7th Cir. 1995). United is correct that the jury instruction was improper under Sutton, but United is wrong to say that it made any difference here.

United went so far to declare in its reply brief that evidence which Gile proffered to disprove prejudice is "irrelevant." It is both relevant and the reason that United loses this claim on appeal. United alleges only that Gile's condition improved under medication, and that the jury was not given the chance to conclude that Gile was not disabled when medicated. United does not demonstrate that substantial harm flowed from

the improper jury instruction, and its speculation that the jury might have decided the case differently if given the proper instruction is insufficient to establish prejudice. In fact, we doubt that the improper jury instruction resulted in substantial harm because Gile suffered significant impairment despite the medication. Gile began taking medication in September 1992, and nearly all the relevant events of the case occurred while Gile was taking regular medication but still suffering serious depression and anxiety. The jury instruction was harmless error.

## C.  Punitive Damages

United moved at the end of trial for judgment as a matter of law on punitive damages, but the district court denied United's motion and the jury awarded $500,000 to Gile in punitive damages, later limited in accordance with 42 U.S.C. sec. 1981a. United now appeals, arguing that the district court's instruction on punitive damages violated the Supreme Court's recent decision in Kolstad v. American Dental Ass'n, 527 U.S. 526, 119 S.Ct. 2118 (1999). We review de novo the district court's denial of motion for judgment as a matter of law. See Tincher, 118 F.3d at 1132.

The district court may award punitive damages in connection with an ADA claim when the defendant engaged in a "discriminatory practice or discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual." See 42 U.S.C. sec. 1981a(b)(1). In Kolstad, a discrimination case under Title VII of the Civil Rights Act, 42 U.S.C. secs. 2000e to 2000e-17, the Supreme Court decided that establishing the requisite "malice or reckless indifference" depends not on the egregiousness of the employer's misconduct, but instead on the "employer's knowledge that it may be acting in violation of federal law." Kolstad, 119 S.Ct. at 2124. Punitive damages are proper when the employer discriminates "in the face of a perceived risk that its actions will violate federal law." Id. at 2125.

It is clear that McGuffin and Gile's floor supervisors knew of the ADA and United's reasonable accommodation policy, but United did not act with reckless disregard for Gile's ADA rights. Gile's supervisors deferred to McGuffin's evaluation, and McGuffin believed that a shift transfer would not have accommodated Gile's disability. McGuffin in good faith disagreed with Orlandino that a shift transfer would enable Gile to work and believed that Gile's psychological condition was a nonoccupational, personal problem

which did not trigger any obligation under the ADA on United's part. Punitive damages depend not on the egregiousness of the defendant's misconduct, or its callousness in denying reasonable accommodation, but instead run from a culpable state of mind regarding whether that denial of accommodation violates federal law. See Kolstad, 119 S.Ct. at 2124; see also Deters v. Equifax Credit Info. Servs., 202 F.3d 1262, 1269 (10th Cir. 2000). United's failure to accommodate Gile's disability amounted to negligence because it misunderstood Gile's difficulties, did not regard her condition a disability and neglected to pursue Gile in developing an alternative accommodation. Although United wrongly believed that Gile was not disabled under the ADA and did not adequately address her accommodation request, United did not exhibit the requisite reckless state of mind regarding whether its treatment of Gile violated the ADA. The district court should have granted United's motion for judgment as a matter of law regarding punitive damages, and we will reverse the award of punitive damages, leaving Gile with a judgment for $200,000 in compensatory damages.

III.  Conclusion

   For the foregoing reasons, we AFFIRM the judgment for Cheryl Gile of compensatory damages but REVERSE the award of punitive damages.

 DIANE P. WOOD, Circuit Judge, concurring in part and dissenting in part. I agree with the conclusion of the majority in Parts II.A. and II.B. of the opinion that United Airlines has shown no reason to upset the jury's verdict in favor of Cheryl Gile on compensatory damages and that the erroneous instruction about mitigating measures was harmless error. I would not, however, reverse the jury's award of punitive damages, reduced as it was required to be under 42 U.S.C. sec. 1981a(b)(3) from $500,000 to $100,000 (which kept the total verdict within the statutory $300,000 cap). As the majority states, under Kolstad v. American Dental Ass'n, 527 U.S. 526, 119 S.Ct. 2118 (1999), the requisite malice or reckless indifference required for a punitive damage award is present when the employer discriminates "in the face of a perceived risk that its actions will violate federal law." 527 U.S. at ___, 119 S.Ct. at 2125.

   The jury was entitled to find, as it did, that this is precisely what United did, through its authorized decisionmaker, Regional Medical Director Dr. Robert McGuffin. McGuffin was

responsible for handling the accommodation process for United employees whose medical condition called into question their fitness to work. He unquestionably knew about United's ADA policy, as the majority agrees. The jury did not believe that McGuffin seriously thought that a shift transfer would not have accommodated Gile's disability, or that his view was formed in good faith. Instead, he behaved with astonishing callousness in the face of Gile's disability, twice insensitively telling her she should just quit or resign and dismissing her complaints as "mere" personal problems in the face of the extensive medical documentation to the contrary from a professional United itself recommended. I do not disagree with the majority that the record did not compel a finding of malice or reckless indifference; had Gile filed a proper partial Rule 50 motion, she would not have been entitled to judgment as a matter of law on that point. But on this record the jury was certainly entitled to find that United had engaged in reckless behavior.

I therefore respectfully dissent from Part II.C. of the opinion, which reverses the jury's award of punitive damages.