OPINION OF THE COURT
 

 SLOVITER, Circuit Judge.
 

 Jeanette Colwell, a former part-time retail clerk at a Rite Aid store in Pennsylvania, appeals from the District Court’s order granting summary judgment for the appellee, Rite Aid of Pennsylvania, Inc. (“Rite Aid”),
 
 [1]
 
 in Colwell’s suit claiming disability discrimination.
 

 I.
 

 Background
 
 [2]
 

 Sometime in April 2005, Colwell was hired as a cashier at the Rite Aid store in Old Forge, Pennsylvania at the rate of $5.25 per hour. Because of her personal preferences, her available hours were 9 a.m. to 2 p.m. or 5 p.m. to 9 p.m. Although the shifts that she worked varied, most were for weekdays from 5 p.m. to 9 p.m. During her employment at Rite Aid, Col-well was recognized by her superiors for good performance.
 

 In the summer of 2005, Colwell was diagnosed with “retinal vein occlusion and glaucoma in her left eye,” and eventually became blind in that eye.
 
 Colwell v. Rite Aid Corp.,
 
 No. 3:07cv502, 2008 WL 4748226, at *1 (M.D.Pa. Oct. 27, 2008). Although able to see out of her right eye and to perform her duties at work, in mid-September 2005 Colwell informed her supervisor Susan Chapman that her partial blindness made it dangerous and difficult for her to drive to work at night. Colwell claims, and Rite Aid does not dispute, that public transportation was not an option for her because bus service ended at 6 p.m. and there were no taxis. Nonetheless, Chapman told Colwell that she would not be assigned only to day shifts because it “wouldn’t be fair” to the other workers. App. at 188.
 

 Sometime in late September or early October, Colwell sent Chapman a note from her doctor stating “I recommend [that] Mrs. Jeanette Colwell not drive at night.” App. at 434. After receiving the note, Chapman again informed Colwell that she was unwilling to assign Colwell exclusively day shifts. During that conversation, Colwell told Chapman that her “grandson will [pick her up] when he could,” App. at 191, but Colwell also claims to have said that she could not “depend on people all the time,” App. at 191. Indeed,
 
 *499
 
 although Colwell did not miss a day of work because of her vision loss except for medical treatment for that condition in August 2005, she asserts that shuttling her to and from work for night shifts created a hardship for her family. Chapman, however, continued to schedule Colwell for a mixture of day and night shifts.
 

 Soon after the second conversation with Chapman, Colwell discussed her desire to change to day shifts with Ken Karasek, her union representative. Karasek then contacted Chapman to discuss the matter. After that conversation, Karasek called Colwell and told her that “he got nowhere” with Chapman. App. at 190. Undeterred, Karasek proposed and scheduled a meeting between himself, Chapman and Col-well. Karasek then failed to show up at the meeting. Sometime after, Karasek called Colwell to explain that “he got tied up.” App. at 190. He said that “he would set up another meeting.”
 
 Id.
 
 However, Colwell was “too fed up at the time ... [and] decided to write a letter of resignation and hand it in ... [because she] was so frustrated and angry.” App. at 190. Apparently, Karasek never attempted to set up the meeting before Colwell resigned.
 

 On October 12, 2005, Colwell submitted her resignation by leaving Chapman a handwritten note that gave two weeks notice. Colwell’s note stated: “I feel I have not been given fair treatment. There has been prejudice against me. I have been picked on and lies have been told about me. No one deserves that kind of treatment.” App. at 435. Neither Chapman nor anyone else at Rite Aid responded to Colwell’s note.
 

 A few months later, Colwell filed this lawsuit in the United States District Court for the Middle District of Pennsylvania against Rite Aid and Chapman. The complaint stated the following causes of action against Rite Aid: (1) claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101,
 
 et seq.
 
 (“ADA”) and the Pennsylvania Human Relations Act, 43 P.S. §§ 951,
 
 et seq.
 
 (“PHRA”) for failure to accommodate Colwell’s partial blindness, for constructive discharge, and for retaliation; and (2) claims of age discrimination under both the Age Discrimination in Employment Act, 29 U.S.C. §§ 621,
 
 et seq.
 
 (“ADEA”) and the PHRA. Colwell also asserted claims against Chapman under the PHRA for aiding and abetting the alleged age and disability discrimination. Following discovery, the parties filed motions for summary judgment.
 

 The District Court granted Rite Aid’s motion and denied Colwell’s motion. Concerning the ADA claims, the District Court held that Colwell’s vision problem qualified her as disabled under the ADA. It reasoned that a reasonable juror could so conclude from Colwell’s testimony that she “has substantial difficulties with depth perception,”
 
 Colwell,
 
 2008 WL 4748226, at *6, making it difficult for her to drive at night.
 

 The Court held, however, that Colwell did not suffer any adverse employment action cognizable under the ADA and PHRA.
 
 [3]
 
 More specifically, the Court granted Rite Aid summary judgment on Colwell’s failure to accommodate claim. The Court noted that the parties agreed that Colwell “did not need an accommodation to perform her job once she arrived at work.”
 
 Id.
 
 at *9. In light of that agree
 
 *500
 
 ment, the Court stated that “the accommodations that [Colwell] sought had nothing to do with the work environment or the manner and circumstances under which she performed her work,” and thus Rite Aid “had no duty to accommodate [Col-well] in her commute to work.”
 
 Id.
 
 In so holding, the District Court concluded that “the ADA is designed to cover barriers to an employee’s ability to work that exist inside the workplace, not difficulties over which the employer has no control,”
 
 id.
 
 at *8, and that imputing a duty to accommodate Colwell was tantamount to “mak[ing] an employer responsible for how an employee gets to work, a situation which expands the employer’s responsibility beyond the ADA’s intention,”
 
 id,,
 
 at *9.
 

 The Court additionally found that Col-well “was not constructively discharged.”
 
 Id.
 
 at *7. The Court noted that Colwell had offered evidence that Chapman “picked on her, forced her to work in a small, isolated area and ignored her[,] ... [and] made disparaging comments about [Colwell], implying that she was slow and could not see ... [and that Chapman] did not allow [Colwell] to perform jobs on the store floor, unlike her coworkers.”
 
 Id.
 
 The District Court characterized these slights as “not rare experiences for American workers” and held that “a juror could not conclude that a reasonable person would feel compelled to resign under the circumstances described by [Colwell].”
 
 Id.
 
 The coui’t also obsexrved that, for a constructive discharge claim to lie, an employee must try to alleviate her difficulties before resigning, and that Colwell quit before a second meeting between her, Chapman, and Karasek could be organized.
 
 Id.
 

 The Court held that Rite Aid’s failure to reschedule Colwell did not amount to a cognizable retaliatory action and that, in any event, Rite Aid did not appear to take any action at all in connection with Colwell having asked for an accommodation.
 
 Id.
 
 at *10-11. In addition to its rejection of Colwell’s claim based on disability, the Court granted Rite Aid summary judgment on Colwell’s age discrimination claim because the alleged comment by Chapman that Colwell was “slow” and the asserted preferential tx-eatment of younger workers in assignments, as well as other petty slights, did not constitute adverse action taken on account of age.
 
 Id.
 
 at *11-12.
 

 II.
 

 Discussion
 

 Colwell timely appealed. She lists the following two issues for review:
 

 1. Whether a shift change request can be considered a reasonable accommodation for an employee who cannot drive at night because she is blind in one eye, which causes depth perception problems?
 

 2. Whether being called “slow”, picked on, not being allowed to perform jobs like younger, less senior workers, denied reasonable accommodation x-equests, and unaddressed complaints of unfair tx-eatment precluded the district court from concluding, as a matter of law, that no juror could conclude that Colwell was constructively discharged and suffered an adverse action?
 

 Appellant’s Br. at 2. Rite Aid responds by arguing, inter alia, that Colwell “cannot establish either that she is disabled or that she suffered an adverse employment action, as the result of which plaintiff has failed to establish a
 
 prima facie
 
 case of disability discrimination^]” Appellee’s Br. at 1. Because the issues Colwell presents would fail were Ride Aid coxrect in its argument that she failed to establish that she is disabled, we reach that issue first.
 

 Our review of the District Court’s grant of summary judgment is plenary.
 
 Horn v. Thoratec Corp.,
 
 376 F.3d 163, 165 (3d Cir.
 
 *501
 
 2004).
 
 [4]
 
 Summary judgment should be granted “if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c)(2). “The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 

 A. Disability
 

 In 2005, the relevant definition of the “term ‘disability’ [was], with respect to an individual ... a physical or mental impairment that substantially limits one or more of the major life activities of such individual....”
 
 [5]
 
 42 U.S.C.A. §12102(2) (2005). Therefore, “to establish a statutorily protected disability, the employee must show that she has an impairment; identify the life activity that she claims is limited by the impairment; and prove that the limitation is substantial.”
 
 Fiscus v. Wal-Mart Stores, Inc.,
 
 385 F.3d 378, 382 (3d Cir.2004) (citing
 
 Bragdon v. Abbott,
 
 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)).
 

 There can be no doubt that Colwell’s blindness in one eye is a physical impairment.
 
 See Albertson’s, Inc. v. Kirkingburg,
 
 527 U.S. 555, 563, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999); 29 C.P.R. § 1630.2(h)(i) (2005). Nor is there any doubt that seeing is a major life activity.
 
 Albertson’s,
 
 527 U.S. at 563, 119 S.Ct. 2162. Instead, Rite Aid argues that Col-well has failed to show that her ability to see is substantially limited by her partial blindness. More specifically, Rite Aid argues that Colwell “has offered no evidence that the extent of her limitation was substantial during the time that she was working for Rite Aid” because “Colwell testified at her deposition that her only limitation as the result of her left eye blindness is her inability to drive at night.” Appellee’s Br. at 13.
 

 In
 
 Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,
 
 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), the Supreme Court stated that “[i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of
 
 *502
 
 an impairment.” “Instead, the ADA requires those ‘claiming the Act’s protection ... to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial.’ ”
 
 Id.
 
 (quoting
 
 Albertson’s,
 
 527 U.S. at 567, 119 S.Ct. 2162). “ ‘[Substantially’ in the phrase ‘substantially limits’ suggests ‘considerable’ or ‘to a large degree,’”
 
 id.
 
 at 197, 122 S.Ct. 681 (citation omitted), but the ADA contemplates limitations and does not mandate that plaintiffs have “utter inabilities,”
 
 Bragdon v. Abbott,
 
 524 U.S. 624, 641, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). In fact, the Supreme Court made clear that a monocular plaintiffs burden to show that she is disabled is not an “onerous” one because “people with monocular vision ‘ordinarily’ will meet the Act’s definition of disability.”
 
 [6]
 

 Albertson’s,
 
 527 U.S. at 567, 119 S.Ct. 2162.
 

 In
 
 Albertson’s,
 
 the Supreme Court listed the following factors as relevant to determining whether persons with monocular vision are disabled under the ADA: “the degree of visual acuity in the weaker eye, the age at which they suffered their vision loss, the extent of their compensating adjustments in visual techniques, and the ultimate scope of the restrictions on their visual abilities.”
 
 Id.
 
 at 566, 119 S.Ct. 2162. As the EEOC points out, the record evidence is that Colwell has “no visual acuity in her left eye, .... that [she] was in her mid 60’s when she became blind, and that she engaged in no compensating adjustments.” EEOC Br. at 12. Additionally, Colwell testified that she has pressure in her blind eye that she alleviates with prescription drops.
 

 The District Court acknowledged that Colwell’s inability to drive at night was probative of her limited ability to see.
 
 Colwell,
 
 2008 WL 4748226, at *6. Colwell testified that it was dangerous for her to drive at night because the headlights from other ears would confuse her and she could not tell if there was another car next to her. Rite Aid appears to argue that Col-well’s inability to drive at night is not relevant to her ability to see because some courts have found that driving, and driving at night in particular, are not major life activities. It may be that driving and driving at night are not major life activities, but that is not the question presented here, which is whether Colwell’s difficulty in driving at night, and her description of why that exercise is dangerous for her, are relevant to the extent to which her ability to see is restricted. In
 
 Capobianco v. City of New York,
 
 422 F.3d 47, 58 n. 7 (2d Cir.2005), the Second Circuit found that evidence of a plaintiffs ability to drive at night was relevant to his ability to see, and we agree.
 

 The District Court gave careful consideration to Ride Aid’s argument but held that a reasonable jury could find that Col-well is disabled under the terms of the ADA. There is ample evidence to support this finding. Accordingly, we reject Ride Aid’s argument to the contrary and proceed to the issue of constructive discharge.
 

 B. Constructive Discharge
 

 “We employ an objective test to determine whether an employee can recover on a claim of constructive discharge .... [and must therefore] determine whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign.”
 
 Duffy v. Paper Magic Group, Inc.,
 
 265 F.3d 163, 167 (3d Cir.2001) (internal quota
 
 *503
 
 tions and citation omitted). Factors we have found relevant to this issue are whether the employer (1) “threatened [the employee] with discharge” or “urge[d] or suggested] that she resign or retire,” (2) “demote[d] her,” (3) “reduce[d] her pay or benefits,” (4) “involuntarily transferred [her] to a less desirable position,” (5) altered her “job responsibilities,” or (6) gave “unsatisfactory job evaluations.”
 
 Clowes v. Allegheny Valley Hosp.,
 
 991 F.2d 1159, 1161 (3d Cir.1993). None of those circumstances existed here.
 

 Colwell instead asserts that she was “being isolated from other employees, [was] called slow, and [was] not ... allowed to perform jobs on the store floor like other ... workers,” and that management failed to react to her complaints. Appellant’s Br. at 12. Once again, we agree with the District Court that no reasonable juror could find that the actions to which Colwell refers made her workplace so unbearable that a reasonable person would have felt compelled to resign.
 
 See Gray v. York Newspapers, Inc.,
 
 957 F.2d 1070, 1083 (3d Cir.1992) (“[T]he law does not permit an employee’s subjective perceptions to govern a claim of constructive discharge.”) (quoting
 
 Bristow v. Daily Press, Inc.,
 
 770 F.2d 1251, 1255 (4th Cir.1985)). Colwell’s
 
 ipse dixit
 
 assertions that it was inconvenient for her family to shuttle her to and from work are too vague to support a conclusion that she was compelled to resign when she did. Indeed, Colwell never missed a day of work, except for laser treatments for her eyes in August 2005.
 

 In support of its determination that Col-well had not provided a persuasive claim of constructive discharge, the District Court stated that because Colwell did not appeal to higher levels of management and did not attempt to reschedule the meeting between Chapman and the union representative, she made no reasonable effort to explore alternatives before electing to resign. We note that Rite Aid does not argue that Colwell failed to engage in the interactive process required by statute although it does note that she did not file a grievance. Colwell argues that Ride Aid’s failure to accommodate her disability was an adverse employment action that supports her claim of constructive discharge. The EEOC agrees. We consider Rite Aid’s failure to accommodate separately from her constructive discharge claim. For the reasons set forth above, we will affirm the District Court’s grant of summary judgment on Colwell’s claim of constructive discharge.
 
 [7]
 

 C. Failure to Accommodate
 

 Colwell’s principal claim, and the one emphasized by the EEOC, is that the District Court erred in holding that Rite Aid had no duty to accommodate her shift
 
 *504
 
 request. Rite Aid, in addition to its argument that Colwell was not disabled within the meaning of the ADA, contends that even assuming that Colwell was disabled and that it had a duty to accommodate her, it fully satisfied its duty to accommodate Colwell under the ADA.
 

 To establish a prima facie case of discrimination under the ADA, a plaintiff must show, inter alia, that she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer.
 
 Williams v. Phila. Hous. Auth. Police Dep’t,
 
 380 F.3d 751, 761 (3d Cir.2004) (internal quotation and citations omitted). “Adverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiffs disabilities.”
 
 Id.
 
 The term “ ‘[Reasonable accommodation’ further ‘includes the employer’s reasonable efforts to assist the employee and to communicate with the employee in good faith....’”
 
 Id.
 
 at 761 (quoting
 
 Mengine v. Runyon,
 
 114 F.3d 415, 416 (3d Cir.1997)).
 

 Rite Aid concedes that when Colwell is at work, she is able to perform all of her duties. Therefore, the questions at issue regarding Rite Aid’s alleged failure to accommodate are whether Rite Aid had any duty to accommodate Colwell in her request for a shift change, and whether Rite Aid satisfied its duty to accommodate Col-well.
 

 We previously noted the District Court’s discussion of Colwell’s failure to participate in the grievance procedure available through the company and her union. The EEOC argues that Colwell proved all that was required to establish her claim that Rite Aid failed to meet its statutory duty to accommodate an employee with a disability. This court has spoken to this issue, and has stated that: “An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: T) the employer knew about the employee’s disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer’s lack of good faith.’”
 
 Williams,
 
 380 F.3d at 772 (quoting
 
 Taylor v. Phoenixville Sch. Dist.,
 
 184 F.3d 296, 317 (3d Cir.1999)). The record establishes that Chapman knew about Colwell’s disability and that Colwell requested daytime shifts. Moreover, Chapman, testifying that she could not have provided only day shifts, stated, “We’re a union store, okay, and it goes by seniority, too. Full timers were day, night, weekend; part-timers were night and weekends.” App. at 133.
 

 Rite Aid adopts the position of the District Court that employers are not “required to accommodate [the] inability to commute to work independently” because “commuting to and from work falls outside the work environment.” Appellee’s Br. at 29. In other words, Rite Aid argues that it had no duty to even consider changing Colwell’s shift because Colwell’s difficulties amounted to a commuting problem unrelated to the workplace, and the ADA does not obligate employers to address such difficulties. We agree with the EEOC that the reach of the ADA is not so limited. Instead, we hold as a matter of law that changing Colwell’s working schedule to day shifts in order to alleviate her disability-related difficulties in getting to work is a type of accommodation that the ADA contemplates. The statute expressly so provides.
 

 Under the ADA, an employer discriminates against an employee by not making “reasonable accommodations to the known physical or mental limitations of the [em
 
 *505
 
 ployee] unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].”
 
 Williams,
 
 380 F.3d at 761 (internal quotations and citations omitted). “The term ‘reasonable accommodation’ may include— (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time
 
 or modified work schedules,
 
 reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.” 42 U.S.C. § 12111(9)(B) (2005) (emphasis added).
 

 As the EEOC points out, the accommodations listed in § 12111(9)(B) are not exclusive and specifically contemplate workplace accessibility. Indeed, Congress acknowledged that “modified work schedules can provide useful accommodations” and noted that “persons who may require modified work schedules are persons with mobility impairments who depend on a public transportation system that is not currently fully accessible.” H.R.Rep. No. 101-485(11), at 62-63 (1990), reprinted in 1990 U.S.C.C.A.N. 330, 345. Thus, the ADA does not strictly limit the breadth of reasonable accommodations to address only those problems that an employee has in performing her work that arise once she arrives at the workplace.
 

 At least one other court of appeals has recognized this principle. In
 
 Lyons v. Legal Aid Society,
 
 68 F.3d 1512, 1513-14 (2d Cir.1995), an employee who suffered severe physical impairments due to a car accident that prevented her from walking long distances sued her employer, Legal Aid, under the ADA in part for refusing to provide her financial assistance to pay for a parking space close to work. The Second Circuit held that the employee stated an ADA claim because, depending on the circumstances, such an accommodation might be reasonable.
 
 Id.
 
 at 1516. Although we voice no comment on that court’s holding that a reasonable accommodation could include funds to pay for an employee’s parking space, we agree with the court’s observation that “there is nothing inherently unreasonable, given the stated views of Congress and the agencies responsible for overseeing the federal disability statutes, in requiring an employer to furnish an otherwise qualified disabled employee with assistance related to her ability to get to work.”
 
 [8]
 

 Id.
 
 at 1517.
 

 We therefore hold that under certain circumstances the ADA can obligate an employer to accommodate an employee’s disability-related difficulties in getting to work, if reasonable. One such circumstance is when the requested accommodation is a change to a workplace condition that is entirely within an employer’s control and that would allow the employee to get to work and perform her job.
 
 See
 
 29 C.F.R. § 1630.2(o)(l)(ii)-(iii) (2005) (defin
 
 *506
 
 ing reasonable accommodations to include “Modifications or adjustments to the work environment, or to the manner or circumstances under which [a] position ... is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position ... [and][m]odifications or adjustments that enable a covered entity’s employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.”). A change in shifts could be that kind of accommodation.
 

 The District Court’s contrary statement that a change in shifts “had nothing to do with the work environment or the manner and circumstances under which [Colwell] performed her work” is perplexing.
 
 Col-well,
 
 2008 WL 4748226, at *9. As a cashier, Colwell was certainly required to be at work to perform any of the functions of her job, and any change in shifts is clearly a change in a workplace condition entirely under the employer’s control. Although the District Court relied on a number of decisions by district courts that have held that employers are not required to provide an employee with an accommodation that facilitates their commute to work, those cases do not speak to the issue Colwell presents. Our holding does not make employers “responsible for how an employee gets to work.”
 
 Id.
 
 at *6. Indeed, Colwell did not ask for help in the method or means of her commute. The scheduling of shifts is not done outside the workplace but inside the workplace. It is for the jury to decide whether a shift change was a reasonable accommodation under the circumstances.
 
 [9]
 

 In sum, we hold that the ADA contemplates that employers may need to make reasonable shift changes in order to accommodate a disabled employee’s disability-related difficulties in getting to work. As Rite Aid makes no factual argument about the reasonableness of Colwell’s request, nor has it argued before us that scheduling Colwell for day shifts would have been an undue burden, those questions are ultimately for the jury.
 

 Finally, we consider the extent to which the requirement for the parties to engage in the interactive process may affect this case. The District Court concluded that Rite Aid had no duty to accommodate Colwell “in her commute to work” and did not discuss a change in shifts as an accommodation. Colwell, 2008 WL 4748226 at *9.
 

 “[E]ither by direct communication or other appropriate means, the employee ‘must make clear that the [he/she] wants assistance for his or her disability.’ ”
 
 Conneen v. MBNA Am. Bank, N.A.,
 
 334 F.3d 318, 332 (3d Cir.2003) (quoting
 
 Jones v. United Parcel Serv.,
 
 214 F.3d 402, 408 (3d Cir.2000)). “The employer must have enough information to know of ‘both the disability and desire for an accommodation,’ or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation.”
 
 Id.
 
 (quoting
 
 Taylor,
 
 184 F.3d at 313). Indeed, “[t]he law does not require any formal
 
 *507
 
 mechanism or ‘magic words’ to notify an employer that an employee needs an accommodation and circumstances will sometimes require the employer to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn’t know how to ask for it, the employer should do what it can to help.”
 
 Id.
 
 at 332 (internal quotations, citations, and alterations omitted). Once proper notice has been provided, however, “both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith.”
 
 Id.
 
 (quoting
 
 Mengine,
 
 114 F.3d at 420).
 

 Rite Aid argues that it met its obligations under the ADA. More specifically, Rite Aid argues as follows: after Colwell placed Rite Aid on notice of her blindness and inability to drive, Chapman discussed with Colwell her difficulty in getting to work; although Chapman rejected Col-well’s request for a schedule change, Col-well also told Chapman that she could get rides from her grandson, and so Chapman left the conversation believing that the matter was adequately resolved because Colwell did not require an accommodation; Rite Aid’s duties to re-engage in the interactive process never reattached because Colwell did not thereafter inform Rite Aid that she still required an accommodation and thus Rite Aid could not know that one was desired or needed.
 

 A reasonable jury, however, could conclude that Rite Aid failed in its obligations to engage in the interactive process required under the ADA. The record supports a reasonable inference that Colwell told Chapman that she could not always count on her grandson to drive her to work, and that the solution was only a temporary one. Moreover, after Colwell and Chapman spoke, Colwell had Karasek contact Chapman to seek a change in Col-well’s shifts but Kasarek found Chapman immovable in her resistance to any schedule change for Colwell. Colwell’s resignation note also implied that she was unhappy with the status quo of her scheduling and a jury could reasonably infer that Colwell had continued to communicate that unhappiness to Chapman. Chapman’s agreement to meet with Karasek and Col-well would not compel a reasonable jury to find that Rite Aid was willing to negotiate in good faith. Chapman had flatly refused all of Colwell’s overtures to obtain an accommodation, and Rite Aid does not assert that Chapman was willing to offer any accommodations at the meeting.
 

 On the other hand, a reasonable jury could absolve Rite Aid, concluding that Colwell prematurely terminated an ongoing interactive process.
 
 See Taylor,
 
 184 F.3d at 317 (“an employer cannot be faulted if’ the employee’s actions or omissions during the interactive process cause the process’s failure). Rite Aid was scheduled to meet with Colwell and Karasek to discuss Colwell’s concerns, but when Karasek became unavailable, the meeting never occurred. Notwithstanding Karasek’s assurance that “he would set up another meeting,” Colwell decided to submit her resignation. App. at 190.
 

 As another court of appeals has explained,
 

 “A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.” ... The last act in the interactive process is not always the cause of a breakdown, ... and courts must examine the process as a whole to determine whether the evidence requires a finding that one party’s bad faith caused the breakdown.
 

 EEOC v. Sears, Roebuck & Co.,
 
 417 F.3d 789, 805-06 (7th Cir.2005) (quoting
 
 Beck v. Univ. of Wise. Bd. of Regents,
 
 75 F.3d 1130, 1135 (7th Cir.1996)).
 

 
 *508
 
 Under the circumstances presented in this case, a reasonable jury could thus conclude that either party violated the duty to engage with good faith in the interactive process. Because genuine issues of material fact exist on that issue, we cannot affirm the grant of summary judgment on the basis that Rite Aid fully complied with the requirements of the ADA. A fact-finder must settle that dispute.
 

 III.
 

 Conclusion
 

 We will affirm the District Court’s grant of summary judgment on Colwell’s claims under the ADEA asserting retaliation and constructive discharge. For the reasons set out above, we will reverse the District Court’s grant of summary judgment in Rite Aid’s favor as to Colwell’s failure to accommodate claims and remand for further proceedings consistent with this opinion.
 

 [1]
 

 . Rite Aid notes that Colwell has incorrectly identified it in the caption as "Rite Aid Corporation d/b/a Rite Aid.”
 

 [2]
 

 . There is some disagreement among the briefs about the sequence of events and what happened. Because the District Court decided this case on summary judgment, we consider the facts in the light most favorable to Colwell.
 
 E.I. DuPont de Nemours & Co. v. United States,
 
 508 F.3d 126, 132 (3d Cir.2007).
 

 [3]
 

 . As the District Court recognized, the same legal standard that applies to the ADA applies equally to disability discrimination claims under the PHRA.
 
 Kelly v. Drexel Univ.,
 
 94 F.3d 102, 105 (3d Cir.1996). It is similarly "proper to address [ADEA and PHRA age discrimination claims] collectively.”
 
 Kautz v. Met-Pro Corp.,
 
 412 F.3d 463, 466 n. 1 (3d Cir.2005). As a result we will generally reference only the ADA and ADEA in this opinion.
 

 [4]
 

 .
 
 The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. This court has jurisdiction under 28 U.S.C. § 1291. The EEOC has joined Colwell in her appeal as an amicus.
 

 [5]
 

 . We recognize that amendments to the ADA took effect on January 1, 2009.
 
 See
 
 ADA Amendments Act of 2008, Pub.L. No. 110— 325, § 8, 122 Stat. 3553, 3559 (2008). Many of those amendments are irrelevant here, but, among other things, Congress did overrule
 
 Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,
 
 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), referenced below. Neither Colwell nor the EEOC argues on appeal that these amendments are retroactive and therefore should apply in this case. We have yet to rule on the retroactivity of the amendments,
 
 see Hohider v. United Parcel Serv., Inc.,
 
 574 F.3d 169, 188 n. 17 (3d Cir. 2009), but we pause to note that every court of appeals decision of which we are aware has held that the amendments are not retroactive.
 
 See Becerril v. Pima County Assessor’s Office,
 
 587 F.3d 1162, 1164 (9th Cir.2009);
 
 Bytes v. DC Water & Sewer Auth.,
 
 572 F.3d 936, 942 (D.C.Cir.2009);
 
 Thornton v. United Parcel Serv., Inc.,
 
 587 F.3d 27, 35 n. 3 (1st Cir.2009);
 
 Milholland v. Sumner County Bd. of Educ.,
 
 569 F.3d 562, 565 (6th Cir.2009);
 
 EEOC v. Agro Distrib., LLC,
 
 555 F.3d 462, 469 n. 8 (5th Cir.2009);
 
 Fredricksen v. United Parcel Serv. Co.,
 
 581 F.3d 516, 521 n. 1 (7th Cir.2009). In any event, we decline to reach a determination of whether the amendments are retroactive because, like the District Court, we find that Colwell meets the definition of "disabled” under the Supreme Court’s interpretation of the ADA before the 2008 amendments took effect.
 

 [6]
 

 . The Supreme Court's statements regarding individuals with "monocular vision” included "[¡Individuals who can see out of only one eye....”
 
 Albertson’s,
 
 527 U.S. at 567, 119 S.Ct 2162.
 

 [7]
 

 . In a footnote to her opening brief, Colwell asserts that her constructive discharge theory, if correct, would revive her retaliation claim. Colwell, however, makes no effort to address the District Court’s holding that none of the supposedly adverse acts were connected to a retaliatory motive. Indeed, the act central to the constructive discharge claim is the failure to change Colwell’s shifts, and Rite Aid was immediate and consistent in its denial of that accommodation. We therefore affirm the District Court’s grant of summary judgment on Colwell’s retaliation claim.
 

 We also note that in her opening brief Col-well relies entirely on constructive discharge as the single adverse employment action upon which her ADEA claim is based, and she offers only constructive discharge and failure to accommodate as adverse actions based on disability discrimination. Colwell has therefore waived all other arguments.
 
 United States v. Pelullo,
 
 399 F.3d 197, 222 (3d Cir.2005) (“It is well settled that an appellant’s failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.”). Because we agree with the District Court that Colwell cannot show constructive discharge, we will affirm the grant of summary judgment on the ADEA claim.
 

 [8]
 

 . Notably, in
 
 Gile
 
 v.
 
 United Airlines, Inc.,
 
 213 F.3d 365, 368 (7th Cir.2000), the court upheld a jury’s verdict that United Airlines violated the ADA by not changing the shift of a woman whose severe insomnia rendered her unable to perform the functions of her job while at work. The court held that because there was evidence that assigning the employee to day shifts could have alleviated the insomnia, it was permissible for the jury to find United liable for failing to change her shift so that she could get some sleep.
 
 Id.
 
 at 372-73. Although the question of whether an employer is obligated to accommodate a disability-related problem outside of the workplace that influences an employee’s ability to perform the essential functions of her job while at work was not squarely presented in
 
 Gile,
 
 the court at least assumed the existence of such an obligation.
 

 [9]
 

 . The qualification "under the circumstances” is crucial. We do not hold that Rite Aid was required to provide the shift-change that Colwell desired. We recognize that a decision by the employer to allow one of its staff members to work exclusively during daylight hours may be viewed adversely by other workers. This is not a matter to be decided in the abstract. While it may be possible to have a case in which summary judgment would be appropriate on that issue, this is not that case. It will be for the jury to decide here whether Rite Aid can "demonstrate that the accommodation would impose an undue hardship on the operation of [its] ... business. ...”
 
 Williams,
 
 380 F.3d at 761.