RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0309p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

REBECCA EDWARDS,

>    *Plaintiff-Appellee*,

    *v.*

SHELBY COUNTY, TENNESSEE, a Tennessee municipality operating as the Shelby County Health Department,

>    *Defendant-Appellant*.

No. 24-5730

───────────────

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:22-cv-02682—Tu M. Pham, Magistrate Judge.

Argued:  June 12, 2025

Decided and Filed:  November 7, 2025

Before: MOORE, BUSH, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  E. Lee Whitwell, SHELBY COUNTY, Memphis, Tennessee, for Appellant.  Steven G. Wilson, THE STEVE WILSON FIRM, Memphis, Tennessee, for Appellee.  **ON BRIEF:** E. Lee Whitwell, R.H. "Chip" Chockley, Julia Marie Hale, SHELBY COUNTY, Memphis, Tennessee, for Appellant.   Steven G. Wilson, THE STEVE WILSON FIRM, Memphis, Tennessee, Matthew C. Gulotta, THE GULOTTA FIRM, PLLC, Memphis, Tennessee, for Appellee.

---

**OPINION**

---

JOHN K. BUSH, Circuit Judge.   Rebecca Edwards, a former Shelby County Health Department employee, brought this action under the Americans with Disabilities Act (ADA), asserting three claims.  She alleges that the County (1) discriminated against her based on her night blindness, (2) retaliated against her for requesting a related accommodation, and (3) failed to accommodate a separate condition (her asthma).  Following a two-day trial, the jury returned a verdict in her favor on all three claims.  The County now appeals, contending that Edwards is not disabled under the ADA and that the evidence did not support the jury's verdict.

The County primarily argues that neither Edwards's night blindness nor her asthma qualifies as a disability under the ADA, especially given her admitted ability to drive at night on some occasions.  But while the evidentiary record is limited, it is not legally insufficient. Edwards testified in detail about the effect of her impairments on her daily functioning, and the jury was entitled to credit that testimony.  And under the ADA's fact-driven, individualized inquiry, the jury's determination that Edwards is disabled was not unreasonable.  So the County's argument falls short of the standard required to disturb a jury verdict.  We **AFFIRM** the district court's entry of judgment on Edwards's disability-discrimination, retaliation, and failure-to-accommodate claims.

**I.**

In July 2020, Shelby County hired Edwards as a Contact Tracer, a role established in response to the COVID-19 pandemic.  In December 2020, the County promoted her to the position of Environmentalist Inspector, a position that required some nighttime driving. Although Edwards struggled with nighttime driving because of her vision issues, she managed. From January to March 2021, she made several nighttime inspection trips, often relying on the support of colleagues.  She also testified that she sometimes followed the taillights of a sheriff's deputy who would escort her between sites, helping her navigate through the dark.

The County ended its COVID-19 inspection protocol in March 2021, which temporarily relieved Edwards of her nighttime driving responsibilities.  By August 2021, she was reassigned to the Care Coordination Team, where she began working alongside two colleagues, Velma Thomas and Nick Ayers, and under a new manager, Susie Suttle.  Edwards's duties shifted towards direct support, delivering food and groceries to individuals in COVID-19 quarantine at the Econo Lodge in Lakeland, Tennessee.  Many of these individuals were homeless and quarantined by the City.

Edwards felt unsafe working at the Econo Lodge, especially at night.  She testified that she believed it was home to ongoing illegal activity, including drug dealing and prostitution.  She was concerned for her safety as a woman working alone at night in such a place and she worried about her twenty-mile commute home following her shifts.  Edwards's testimony highlighted two episodes she felt demonstrated the danger she was exposed to at the Econo Lodge.  She recounted one incident in which a client left his room without permission, leaving behind drugs and related paraphernalia.  (Ultimately, law enforcement removed the client.)  And she testified about another alarming encounter in which she was approached by a man who identified himself as a bounty hunter.  According to her, this individual asked her to knock on the door of a hotel room, explaining that if he did it himself, the person inside might shoot him.  She documented her safety concerns in an email to her supervisor after being assigned to the night shift.

A.     **EDWARDS'S MEDICAL CONDITIONS**

1.     Night Blindness

Although Edwards initially managed to fulfill her job's night-driving requirements, her ability to see at night had deteriorated over time, making driving at night increasingly unsafe.  She first noticed issues with her night vision in 2014 while driving on the highway after dark.  On that occasion, the brightness of other cars' lights left her unable to see, prompting her to stop driving because she no longer felt comfortable behind the wheel.  Edwards also testified that bright street and traffic lights blind her, creating "halos" around the lights and making it hard to see barricades or street lines.  R. 98, Day 2 Trial Tr., PageID 1381.  She further testified that reading road signs can be difficult or impossible, especially "if a streetlight is coming down on

it." *Id.*  In addition, she stated that, because her depth perception is impaired, she can only see "off-turns" from the expressway once she gets right next to them. *Id.* at PageID 1400.

Edwards expressed that she feels a need to drive much slower than the speed limit, and described how nerve-wracking driving is when it "should come natural[ly]." *Id.* at PageID 1382. She emphasized that her concentration is also affected, that she experiences the same symptoms when she is a passenger in the car, and that it takes "a moment" for her eyes to adjust back whenever she returns from darkness to a lighted place. *Id.* at PageID 1383.  In her words, "if I walk into a bright[ly lit] . . . room, I still wouldn't be able to, like, read a menu." *Id.*  She also stated that in those situations, she usually asks someone to read the menu for her.

Edwards, however, did not disclose any of these eye conditions to the County in her pre-employment questionnaire.  She explained that when she filled out the form, she marked "no" for eye injury and "no" for eye disease because she believed her condition did not fall into either category.  Edwards explained that she did not bring up her night blindness at all during her physical examination because "[t]he doctor said he could only evaluate me on what the job description was." *Id.* at PageID 1384.  And the job description did not include anything about driving at night.

According to Edwards, her vision is 20/25, and she uses glasses only when reading.  Her pre-employment vision examination did not reveal her night blindness because it was conducted during daylight hours.

2.      Asthma

In 2018, Edwards was diagnosed with asthma after a visit to the emergency room for serious breathing difficulties.  She disclosed her asthma diagnosis at the pre-employment physical examination and informed the County that she was managing her condition with the medications Breo and montelukast.  For the next few years, her condition remained stable—until September 2021, when she temporarily lost access to her prescriptions.

The resulting asthma flare-up was severe.  She could not sleep and had extreme difficulty breathing.  At the height of the episode, she even struggled to move from her bedroom to her

bathroom.  The night of September 15th was particularly problematic.  At 4:30 a.m., exhausted and still laboring to breathe, Edwards called her manager, Susie Suttle, and left a voicemail explaining that she would be unable to come to work that day.  Edwards was scheduled to start work at 8:30 a.m., and County policy required employees to notify their supervisor at least thirty minutes before their shift if they could not come in.  Edwards detailed her symptoms—persistent coughing and lack of sleep—and explained the absence of medication to relieve her condition.

At 7:30 a.m., Suttle returned Edwards's call, informing her that it was too late to find a replacement and Edwards would need to come in to work that day.  Although Suttle testified that she did not recall Edwards explicitly requesting the day off, she acknowledged that County policy required only the thirty-minutes-advance notification already mentioned—a requirement that Edwards had fulfilled.  Nonetheless, in response to her supervisor's directive, Edwards ultimately went to work despite her illness.

**B.       SHIFT REASSIGNMENT AND REQUEST FOR ACCOMMODATION**

On October 4, 2021, Suttle reassigned Edwards to a new solo shift, from 3 p.m. to 11 p.m., at the Econo Lodge.  Edwards immediately objected.  She told Suttle that she had night blindness and would need to drive over twenty miles home in the dark, raising not only medical but also personal safety concerns as a woman working alone at night.  Suttle dismissed Edwards's concerns, pointing out that Edwards had previously driven at night.  Edwards clarified that she had only done so when accompanied by co-workers or police escorts.  She also offered to obtain a doctor's note to confirm her night blindness.  She later contacted both her optometrist and pulmonologist for such a note but was unsuccessful.  In any case, Edwards testified that Suttle never again asked for follow-up clarification or medical documentation as to the condition of Edwards's vision.

The morning after Edwards's reassignment, Suttle repeatedly called her to confirm whether she was coming to work that day for her shift.  Edwards said she would come to work but "under protest."  R. 98, Day 2 Trial Tr., PageID 1387.  At 4:07 p.m. that same day (October 5th), Edwards memorialized her protest in writing while at work.  She emailed Suttle and Jennifer Kmet to say that she opposed working this new shift, and she documented the past

criminal activity at the Econo Lodge, including the bounty-hunter incident. Although Edwards never mentioned anything about her night blindness in that email, Edwards testified that she felt compelled to write the email because she "needed help." *Id.* at PageID 1391. According to Edwards, over 100 employees worked for the same COVID unit, but she was the only employee who had this nighttime shift.

Unbeknownst to Edwards, earlier on October 5th—before Edwards's first night shift—Suttle had spoken with Kmet about removing Edwards from Suttle's team. In response to Suttle's concerns about Edwards's attendance and attitude, Kmet asked Suttle to provide documentation of her complaints. Suttle did so by authoring two reports that detailed her frustrations with Edwards. Suttle reported on Edwards's tardiness and unwillingness (and sometimes total failure) to go to the Econo Lodge as required. And Suttle reported that when Edwards did show up for her shift, Edwards got little done and left early. Also included in those reports were references to Edwards's complaints of criminal activity at the Econo Lodge and inability to drive at night.

On the following day, October 6th, the County authorized a schedule change for Edwards. Her new shift would be from 10:30 a.m. to 7:30 p.m. But Suttle did not notify her of that shift change until 10:45 a.m. on the day Edwards was supposed to show up for her first shift on her new schedule. Edwards reported to work that day after 1:00 p.m. to complete her shift and stayed until her shift ended at 7:00 p.m.

## C.    EDWARDS'S TERMINATION

On October 7th, Administrator Cassandra Brown instructed Suttle to document Edwards's schedule modification and respond to Edwards's complaints, copying Kmet. Brown then forwarded Suttle's updated report to HR, asking if it was possible to initiate a disciplinary process addressing Edwards's repeated refusal to follow directives. Suttle also collected four written statements: three from colleagues, who claimed they saw no criminal activity at the Econo Lodge, and one from property manager Hinesh Patel, who described routine sheriff patrols. These statements were all received within twenty-four hours after the decision to discipline Edwards had been set in motion.

On October 8th, Laviette Crutchfield emailed Brown and Kmet recommending Edwards's termination, citing "insubordination," "attendance," and "falsification of information." *See* R. 43-9, Crutchfield Email, PageID 718. Edwards was fired three days later.

On her job-termination date, October 11th, Edwards met with Suttle and Brown, who presented her with a Disciplinary Action Form (DAF) explaining the reasoning behind the decision to terminate her. The DAF detailed the allegations against Edwards, relying solely on information provided by Suttle. Notably, the form confirmed that Edwards had no prior disciplinary record for similar or related conduct and did not mention any of Edwards's prior disclosures to Suttle regarding Edwards's night blindness, Edwards's offer to provide a doctor's note, her difficulty driving at night, or her request for a modified work schedule.

## D.    PROCEDURAL HISTORY AND TRIAL

Almost six months later, on April 9, 2022, Edwards submitted a charge to the Tennessee Human Rights Commission, alleging that she had suffered discrimination based on disability, age, and religion, as well as alleging retaliation. The charge was forwarded to the Equal Employment Opportunity Commission (EEOC) on August 12th.

Without having received her Right to Sue letter, Edwards filed suit on October 5, 2022. In her complaint, she asserted claims under 42 U.S.C. § 1983 (for alleged violations of her federal constitutional due process rights) and the ADA. After the EEOC issued Edwards a Right to Sue letter, she filed her Amended Complaint. As relevant here, her ADA claims were based on the County's alleged failure to accommodate her asthma, discrimination based on her night blindness, and retaliation for her having requested an accommodation for night blindness. Following the close of discovery, Shelby County moved for summary judgment. The district court granted the motion in part, dismissing Edwards's § 1983 claims, but denied the motion as to the ADA claims, which proceeded to trial.

At trial, Edwards called four witnesses: herself, Susie Suttle, Laviette Crutchfield, and Jennifer Kmet. After Edwards rested, Shelby County moved orally for judgment as a matter of law under Federal Rule of Civil Procedure 50. The County argued that Edwards had failed to offer enough evidence for a reasonable jury to conclude that her asthma and alleged night

blindness amounted to disabilities under the ADA. The district court denied the motion, finding that the evidence included conflicting testimony and that credibility determinations were for the jury. The district court also stated that a reasonable jury could find for Edwards based on the record presented.

Shelby County called a single witness in its defense: Velma Thomas. Thomas testified that she worked alongside Edwards and shared the view of Suttle, their supervisor, that Edwards struggled with attendance, punctuality, following instructions, and insubordination. Thomas also described Edwards as difficult to work with and suggested that Edwards exaggerated the conditions at the Econo Lodge. She stated that she had not witnessed any criminal activity at the Econo Lodge and had never heard Edwards express concerns about her vision or difficulty seeing at night. Finally, Thomas noted that she also suffers from asthma but does not find that it interferes with her ability to perform her job.

When the jury retired, the County renewed its motion for judgment as a matter of law, which the district court again denied. The jury found for Edwards on all three claims: failure-to-accommodate (asthma), disability-discrimination (night blindness), and retaliation (night blindness). On her failure-to-accommodate claim, the jury determined that Edwards suffered from asthma, her condition was a disability under the ADA, she requested an accommodation, and the accommodation would not have caused Shelby County undue hardship. On her discrimination claim, the jury determined that Edwards suffered from night blindness, her night blindness was a disability under the ADA, and she proved her termination would not have occurred but for her disability. Lastly, on the retaliation claim, the jury found that the County unlawfully retaliated against Edwards by terminating her just days after she requested a reasonable accommodation. After the verdict was returned, the County again renewed its motion for judgment as a matter of law.

Shelby County timely appealed.

**II.**

We review de novo a district court's denial of a motion (or renewed motion) for judgment as a matter of law under Federal Rule of Civil Procedure 50, "both as to law and as to

sufficiency of the evidence." *Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 545 (6th Cir. 2012). We view the evidence in the light most favorable to the non-moving party, affording that party all reasonable inferences. *Debity v. Monroe Cnty. Bd. of Educ.*, 134 F.4th 389, 398 (6th Cir. 2025). Judgment as a matter of law is warranted when "there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014) (quoting *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005)). We do not "weigh the evidence, evaluate the credibility of the witnesses, or substitute our judgment for that of the jury." *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 537 (6th Cir. 2003) (quoting *Wehr v. Ryan's Fam. Steak Houses, Inc.*, 49 F.3d 1150, 1152 (6th Cir. 1995)).

Title I of the ADA makes it unlawful for employers to discriminate against a qualified individual based on her disability. *See* 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.2(b), (e). The ADA also prohibits employers from discriminating against individuals who have "opposed any act or practice made unlawful" by the ADA or have "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the ADA. 42 U.S.C. § 12203(a); 29 C.F.R. § 1630.12. This provision includes a prohibition on retaliation against an employee who requests reasonable accommodations. *See, e.g.*, *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013). We address in turn each claim on which Edwards prevailed at trial.

## A. DISABILITY DISCRIMINATION

We analyze a claim for disability discrimination rooted in circumstantial evidence under the *McDonnell Douglas* framework before a case is tried on the merits. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023). Under that framework, to establish a prima facie case a plaintiff must show that (1) she is actually disabled or regarded as having a disability; (2) she is otherwise qualified for the position, with or without a reasonable accommodation; (3) she suffered adverse action; (4) her employer knew or had reason to know of her disability; and (5) her position remained open or she was replaced. *Id.*; *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). After a "trial on the merits," however, we must "assess the ultimate question of discrimination" and not "focus on the elements of the prima

facie case . . . ." *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 821 (6th Cir. 2000); *see also Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020). "The question for the court is simply whether there was sufficient evidence to support a finding of . . . discrimination." *Skalka v. Fernald Env't Restoration Mgmt. Corp.*, 178 F.3d 414, 421 (6th Cir. 1999). The "elements of that framework," however, "remain useful ways of thinking about the evidence and how the jury might reasonably have arrived at its verdict." *Id.*

The County's challenge to Edwards's claim is narrow. It argues that the jury erred in finding Edwards disabled because (1) night blindness is not a legally cognizable disability under the ADA, (2) driving (particularly night driving) is not a major life activity within the meaning of the ADA, and (3) Edwards's ability to drive at night demonstrates that she is not substantially limited in any major life activity.

We start with whether night blindness is a legally cognizable disability under the ADA. To prevail on a claim of disability discrimination under the ADA, a plaintiff must first establish that she has a qualifying disability. *See Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020); *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 452–53 (6th Cir. 2004). The ADA broadly defines "disability" to encompass three definitions:

(A) a physical or mental impairment that substantially limits one or more major
    life activities . . . ;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment . . . .

42 U.S.C. § 12102(1).

The jury was properly instructed on each of the three definitions, but it is unclear which definition it applied to Edwards. We need not reach this issue because Edwards presented enough evidence for a reasonable jury to conclude that her actual impairment substantially limits a major life activity and is thus disabled under the definition provided by § 12102(1)(A)—that is, she has "a physical or mental impairment that substantially limits one or more major life activities . . . ."

The ADA and its implementing regulations define "physical or mental impairment" broadly, including "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems . . . ." 29 C.F.R. § 1630.2(h)(1). The County does not argue that night blindness does not qualify as an impairment, which the court determines by reference to the "defin[ition] in [the] federal regulations." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019).

To qualify as a disability, such an impairment must "substantially limit" one or more major life activities. This determination is relative and is assessed by comparing the individual's abilities to those of the general population. *See* 29 C.F.R. § 1630.2(j)(1)(ii). The regulations clarify that an impairment "need not prevent, or significantly or severely restrict" performance of a major life activity to be considered substantially limiting. *Id.* In fact, the required level of functional limitation to qualify as an impairment under the ADA is rather low. *See id.* § 1630.2(j)(1)(i) ("The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard."); *id.* § 1630.2(j)(1)(iv) ("[T]he term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the [ADA Amendments Act of 2008].").

The ADA and its implementing regulations provide an extensive (but non-exhaustive) list of what constitutes a "major life activity." The examples include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); *see also* 29 C.F.R. § 1630.2(i)(1)(i). And the regulations caution that "the term 'major' shall not be interpreted strictly to create a demanding standard for disability." 29 C.F.R. § 1630.2(i)(2).

Congress has also provided more general guidance for courts interpreting "disability" in the context of the ADA. The ADA Amendments Act of 2008 (ADAAA) directed courts to interpret the definition of disability to favor broad coverage. *See* 42 U.S.C. § 12102(4)(A); 29 C.F.R. § 1630.2(j)(1)(i) (incorporating a "rule of construction" requiring the definition of

disability to be "construed broadly in favor of expansive coverage, to the maximum extent permitted" by the Act). This standard lowers the threshold for establishing disability, focusing the inquiry more on whether discrimination occurred than on whether a plaintiff meets a stringent definitional threshold. And the ADA rejects categorical approaches to disability determinations and favors individualized evaluations of whether an impairment "substantially limits" a major life activity. *See* 29 C.F.R. § 1630.2(j)(1)(iv). Such evaluations are fact-specific inquiries into how particular impairments affect particular life activities. *See id.*; *id.* § 1630.2(j)(1)(viii); *id.* § 1630.2(j)(4); *see also, e.g.*, *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 300–01 (6th Cir. 2019) (engaging in fact-specific analysis); *Andrews v. Tri Star Sports & Ent. Grp., Inc.*, No. 23-5700, 2024 WL 3888127, at *3–5 (6th Cir. Aug. 21, 2024) (same).

The County, like the district court, recognizes that the Sixth Circuit has not yet issued a binding opinion addressing whether night blindness qualifies as a disability under the ADA. In arguing that night blindness does not constitute a disability, the County relies on *Wade v. General Motors Corp.*, 165 F.3d 29, 1998 WL 639162 (6th Cir. 1998) (unpublished table decision), a pre-ADAAA case in which we found that vision problems affecting night driving did not qualify as a disability. In *Wade*, the plaintiff had trouble seeing in the dark, which prevented him from driving at night, so he asked his employer not to schedule him for night shifts. *Id.* at *1. We concluded that the plaintiff failed to show that he was disabled under the ADA because he failed to show a "substantial limitation," reasoning that night driving difficulties are common, particularly among people over the age of forty-five, and that treating such limitations as disabilities would stretch the ADA's definition too far. *Id.* at *2. The County argues that we should apply the same reasoning to this case and hold that night blindness cannot be an ADA-recognized disability.

The *Wade* reasoning, however, has been superseded by the ADAAA. Its amendments substantially broadened the definition of disability and explicitly rejected the narrower approach of cases like *Wade*. *See Morrissey*, 946 F.3d at 299 (recognizing that pre-ADAAA cases assessing disability status are no longer good law); *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 848–49 (6th Cir. 2018) (noting that the ADAAA "invalidate[s] [prior] decisions . . . to 'restore the intent and protections of the Americans with Disabilities Act'" (quoting ADA Amendments

Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553)).  Following the ADAAA's enactment, the "substantial[] limit[ation]" inquiry requires an evaluation of how an impairment affects an individual's daily life compared to the general population.  *See* 29 C.F.R. § 1630.2(j)(1)(ii).  The standard is notably generous: an impairment need not "significantly or severely restrict" a major life activity to qualify as substantially limiting.  *Id.*  This amended standard persuades us to reject the County's argument that Edwards's night blindness could not constitute a substantial limitation.

Nor are we convinced by the County's next line of attack—that driving is not, standing alone, a major life activity under the ADA.  In the context of Edwards's claim, one requirement of her job is to drive at night.  Driving is inherently dependent on the ability to see, and seeing *is* a major life activity that the ADA expressly recognizes.  42 U.S.C. § 12102(2)(A).  So the proper focus is on whether Edwards's impairment substantially limits her ability to see.

Framing the issue in this way aligns with how other circuits have resolved similar cases. Take the Second Circuit in *Capobianco v. City of New York*, 422 F.3d 47 (2d Cir. 2005).  There, even before the 2008 ADA amendments, the Second Circuit held that a reasonable jury could find that the plaintiff's congenital night blindness qualified as an ADA disability.  *Id.* at 58–60. Though the plaintiff's condition left his daytime vision intact, it qualified as a disability because it substantially impaired his ability to function in low-light conditions, and he was unable to drive at night unless he was in "the most familiar and well-lit surroundings."  *Id.* at 53–54, 59– 60.  The Second Circuit emphasized that seeing is a fundamental life activity; most people can safely navigate, drive, or engage in outdoor activities at night; and the plaintiff lacked these capabilities because of his condition.  *Id.* at 59.

And after the ADAAA was enacted, the Ninth Circuit found, in *Livingston v. Fred Meyer Stores, Inc.*, that a plaintiff raised a triable issue of fact as to whether her night blindness substantially limited her ability to see.  388 F. App'x 738, 740 (9th Cir. 2010).  The plaintiff's condition prevented her from safely driving or walking outside after dark, affecting her ability to complete everyday tasks during the fall and winter months.  *Id.*  at 741.  The Ninth Circuit concluded that such limitations, which the average person does not face, could support a finding

of disability under the ADA and reversed and remanded the case because the plaintiff had presented a genuine issue of material fact as to whether she was disabled. *Id.* at 742.

Finally, in *Colwell v. Rite Aid Corp.*, the Third Circuit held that the plaintiff's (Colwell) monocular blindness (total vision loss in one eye) could qualify as a disability under the ADA because it substantially limited the major life activity of seeing. 602 F.3d 495, 501–02 (3d Cir. 2010). Although Colwell's employer, Rite Aid, argued that Colwell's only limitation was her inability to drive at night, the court emphasized that this impairment "was relevant to [the plaintiff's] ability to see." *Id.* The Third Circuit found that Colwell's night-driving difficulties—caused by glare and depth perception issues—were relevant evidence of a substantial visual impairment. *Id.* at 502. Relying in part on *Capobianco*, the Third Circuit concluded that difficulties with night driving could illustrate a substantial limitation on seeing, a recognized major life activity. *Id.* Because Colwell had no vision in one eye and experienced real safety risks at night, the court found that a reasonable jury could determine that her impairment was disabling under the ADA. *Id.*

Together, these cases support the proposition that substantial limitations on night vision may serve as strong evidence of a substantial impairment to the major life activity of seeing. They also display an avoidance of categorical rulings about whether night blindness "substantially limits" plaintiffs, and a preference for assessing how the impairment affects the individual in context. Given that the ADA favors individualized inquiries over categorical approaches in the substantial limitation analysis, *see* 29 C.F.R. § 1630.2(j)(1)(iv), we concur in our sister circuits' approach. We therefore conclude that Edwards introduced sufficient evidence for the jury reasonably to find that her night blindness qualified as a disability.

To be clear, night blindness is not a disability per se. There may be a case where a mild difficulty seeing at night does not substantially limit any major life activity. Our ruling today does not stand for the proposition that someone experiencing night blindness is necessarily disabled under the ADA. We simply hold that the jury was not unreasonable in finding, based on the evidence presented at trial, that *Edwards's* night blindness constituted a disability insofar as it substantially limited *her* ability to see.

The County advances one other major argument: that Edwards cannot be considered disabled because she can and does drive at night. It is true that Edwards testified at trial that she has, on occasion, driven after dark—to her mother's house, to the grocery store, or to the pharmacy when necessary. Edwards explained, however, that she drives at night only when she has no alternative. Such situations include caring for her Alzheimer's-afflicted mother or needing food or medication. The jury heard both aspects of Edwards's testimony and was entitled to weigh her credibility accordingly.

More importantly, the County's argument is beside the point. The ADA does not require an individual to be entirely unable to perform a major life activity to qualify as disabled. As discussed, courts have recognized that individuals who can technically perform an activity, but with difficulty, pain, or risk, may still be substantially limited. *See, e.g.*, *Morrissey*, 946 F.3d at 300 (plaintiff satisfied her burden of showing she is disabled where evidence in the record demonstrated that she had trouble bending over, walked with a slight hunch, and had a pained expression after completing a day of work); *see also* 28 C.F.R. § pt. 35, app. C ("[A]n individual whose impairment causes pain or fatigue that most people would not experience when performing that major life activity may be substantially limited."). This is also true in the context of vision impairments. As discussed above, the Second, Third, and Ninth Circuits have recognized that individuals whose vision-related impairments make night driving unsafe in most conditions may be substantially limited in the major life activity of seeing. *Capobianco*, 422 F.3d at 58; *Colwell*, 602 F.3d at 501–02; *Livingston*, 388 F. App'x at 740. Thus, the fact that Edwards occasionally drives at night should not necessarily preclude a finding of disability. The relevant question is not whether she is capable of driving, but whether her condition substantially limits her ability to see, especially under conditions where most people would have no difficulty.

The County's position boils down to a challenge to the sufficiency of the evidence supporting the jury's verdict. Admittedly, the evidentiary record is limited because Edwards's claims rest primarily on her own testimony. But ultimately, whether an individual's impairment "substantially limits" a major life activity under the ADA is a fact-driven inquiry, and credibility determinations are squarely within the province of the jury. And the jury heard sufficient testimony to conclude that Edwards's night blindness substantially limited her ability to see. At

trial, Edwards testified that her night blindness made it difficult to see surrounding traffic in her mirrors, read road signs and exits, and detect barricades. She also described secondary effects, including heightened anxiety that interfered with her concentration, particularly after exposure to bright lights. She explained that during those periods—whether after driving, riding as a passenger, or simply being exposed to headlights—she struggled to read her mail, watch television, or even look at a restaurant menu. In addition, she testified that her condition had been diagnosed by a doctor, had worsened over time, and impaired the sensory function of her eyes.

On appeal, we must view the evidence in the light most favorable to Edwards and avoid reweighing credibility. Based on this record and given the ADA's broad remedial purpose and emphasis on expansive coverage, there is a reasonable basis to affirm the jury's verdict. Perhaps reasonable jurors could differ on whether Edwards's limitations meet the statutory threshold. But it is certainly not the case that the evidence is so lacking or so one-sided that *no* reasonable jury could find in Edwards's favor. *See Wallace,* 764 F.3d at 586. Accordingly, the district court did not err in holding there was sufficient evidence to sustain the verdict.

## B.    RETALIATION

The County also challenges the jury's verdict on Edwards's retaliation claim. To establish a prima facie case of retaliation, a plaintiff must show that "(1) [she] engaged in activity protected under the ADA; (2) [her] employer knew of that activity; (3) [her] employer took an adverse action against [her]; and (4) there was a causal connection between the protected activity and the adverse action." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). Once again, after the case has been tried on the merits, our "review 'focus[es] on the ultimate question of [the existence of] discrimination rather than on whether a plaintiff made out a prima facie case.'" *Khalaf*, 973 F.3d at 482 (quoting *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005)); *see also Tisdale*, 415 F.3d at 529.

An individual may bring a retaliation claim even if she is not ultimately found to be disabled under the ADA. *See Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 423 (6th Cir. 2015) ("[T]he pertinent inquiry [for an ADA retaliation claim] is not whether [the plaintiff] proved he

had a disability under the ADA, or whether [his employer] had specific knowledge of [the plaintiff's] alleged disability, but rather, whether [the plaintiff] showed a good-faith request for reasonable accommodations."). Instead, the County argues that Edwards's request for an accommodation was not made in good faith because her true concern was about crime, not night blindness. *See Baker v. Windsor Republic Doors*, 414 F. App'x 764, 777 n.8 (6th Cir. 2011) (explaining a good-faith request for accommodation is a "protected act").

In support, the County cites Edwards's October 5, 2021 email, in which she expressed safety concerns about working alone at night in an area she described as involving "drug dealing, prostitution and other violent crimes." *See* R. 43-21, Brown-Suttle Emails, PageID 758; Appellant Br. 8–9. In that email, Edwards said that she considered it "hazardous" to her "well-being" to be a female working alone on the night shift, and that in the past she only worked under similar circumstances when "accompanied by a co-worker(s) and escorted by Memphis Police Officers and Shelby County Sheriffs." R. 43-21, Brown-Suttle Emails, PageID 758. The County highlights that, despite her concerns, Edwards showed up to work but left early. When asked about why she left early, Edwards testified:

> "I just started getting scared. When I drove up that day . . . [t]here was a suspicious character I'd never seen before. And I just started thinking all kinds of thoughts like, okay, if he pulls me in, nobody will miss me. What am I going to do? So around somewhere between 8:00 and 8:30 I just got in the car and I drove home."

R. 98, Day 2 Trial Tr., PageID 1398. The County thus argues that these two pieces of evidence, along with Edwards's multiple admissions that she can and does drive at night, show that her request for an accommodation was not made in good faith.

Although Edwards did not document her night blindness in this particular email, she presented the jury with other evidence showing that she made the County aware of her night blindness and that she otherwise requested accommodation in good faith. Edwards testified that the day before sending the email, she informed Suttle in person that she "cannot work th[e] [night] shift" because she "can't see driving at night" and "ha[s] nyctalopia" or "night blindness." R. 98, Day 2 Trial Tr., PageID 1374. The jury also heard testimony about her medical history and prior treatment for night blindness, including her description of symptoms

and the difficulties she experiences seeing and driving in low-light conditions. She further explained that although she occasionally drove at night for work in the past (before being put on Suttle's team), those instances were infrequent and typically involved assistance from a co-worker and one or two police escorts—unlike the persistent solo night-shift assignment from Suttle.

On this record, a jury could reasonably conclude that Edwards's request was grounded in a concern about her ability to drive safely at night, even if she was also concerned about crime and personal safety. At trial, the jury must have found Edwards's testimony credible and rejected the County's position, because it returned a verdict in Edwards's favor. It is not our place to second-guess this credibility determination on appeal. Ultimately, viewing the evidence in the light most favorable to Edwards, the County has not met its burden of showing that no reasonable jury could have found that Edwards engaged in protected activity and was retaliated against for doing so.

## C.   FAILURE TO ACCOMMODATE

The County also challenges the jury's conclusion that the County failed to accommodate Edwards's asthma, arguing that her asthma does not render her disabled under the ADA. For failure-to-accommodate claims, courts apply the "direct evidence" test. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). The direct evidence test is as follows:

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Id.* at 869 (quoting *Hedrick*, 355 F.3d at 452) (cleaned up); *see also Tchankpa*, 951 F.3d at 811.

Here, again, the County disputes only whether Edwards suffers from a disability, arguing that her asthma does not qualify because it did not "rise to the level of a substantial limitation." Appellant Br. 32 (quoting *Boker v. Sec'y, Dep't of Treasury*, No. 07-CV-446, 2009 WL

3199074, at *5 (S.D. Ohio Sept. 29, 2009)). The County contends that Edwards's symptoms arise only in response to certain stimuli, that her condition is not constantly or severely symptomatic, and that she is able to control her asthma with medication. And the County further contends that the incident underlying this failure-to-accommodate claim occurred on just one day and resulted from Edwards's running out of medication. The County characterizes that incident as a brief, isolated episode insufficient to establish a disability.

We find that the jury was not unreasonable in concluding that Edwards's asthma constitutes a disability under the ADA's individualized-assessment framework. The first problem with the County's position is that the ADA does not require a condition to be permanent or continuously symptomatic to qualify as a disability. Rather, impairments that occur episodically or intermittently may still constitute disabilities if, when active, they substantially limit a major life activity. *See* 42 U.S.C. § 12102(4)(D). And under the ADAAA, the inquiry into whether a condition is substantially limiting must be made without regard to whether medication can ameliorate the condition. *Id.* § 12102(4)(E)(i). The County's attempt to disqualify Edwards because her condition is episodic and usually manageable with medication thus fails.

The County's position has another major problem: the trial record contains sufficient evidence to support the jury's finding that Edwards's asthma imposes real limitations on one or more major life activities, qualifying her as disabled under the ADA. Edwards testified that her asthma, when triggered, restricts her ability to breathe, sleep, and even walk short distances. The jury heard her testimony that exposure to common irritants such as perfumes or smoke predictably provokes asthma attacks, forcing her to rely on her rescue inhaler. Edwards also disclosed her asthma to the County during her pre-employment physical examination. Moreover, the jury was properly instructed that breathing, sleeping, and walking are major life activities under the ADA. And we can infer that the jury concluded that Edwards's episodic asthma substantially limits one or more of those activities, because the jury found that Edwards's asthma qualified as a disability under the ADA. Viewed in the light most favorable to Edwards, the evidentiary record provides sufficient support for the conclusion that Edwards's asthma imposes substantial limitations that entitle her to ADA protection.

The County, of course, disagrees, and relies on our unpublished decision in *Andrews v. Tri Star Sports & Entertainment Group, Inc.* to argue that the jury erred in finding Edwards disabled because of her asthma. 2024 WL 3888127, at *1. In *Andrews*, we concluded that the plaintiff failed to demonstrate that her asthma substantially limited her breathing, and thus her asthma did not meet the ADA's definition of disability. *Id.* at *5. Our decision rested heavily on the plaintiff's own testimony that showed she was "able to physically perform well beyond the average person," and she described only minor, situational limitations such as avoiding "extra strenuous" activities, cardio-intensive exercise, cold weather, and exposure to synthetic fog or spray cleaners. *Id.* at *4–5. The plaintiff acknowledged that her doctor never advised her to avoid any specific activities given her asthma, and she reported no additional self-imposed restrictions. *Id.* at *4. And the plaintiff's ability to engage in high-level physical activities—including CrossFit, gymnastics, international travel, and musical theater—undermined her claim that her asthma substantially limited her breathing relative to the average person. *Id.* at *5.

The County's reliance on *Andrews* is thus misplaced because the factual circumstances of *Andrews* sharply differ from those here. The *Andrews* plaintiff could not identify any concrete incident where her asthma substantially impaired her breathing outside of strenuous circumstances (like "extra strenuous" exercise), she provided no evidence of asthma attacks occurring at any point beyond her original diagnosis, and she acknowledged that her asthma did not impose limitations beyond those experienced by the average person. *Id.* at *4–5. In fact, the *Andrews* plaintiff lived an incredibly active lifestyle apparently mostly unhindered by her alleged impairment. *Id.* Edwards, on the other hand, testified as to how she suffered substantial limitations on her everyday life if she did not have her medication. She detailed a specific episode in which her asthma became active because she did not have access to her medication, and she explained how the onset of an asthma attack makes everyday life activities—like walking, breathing, and sleeping—difficult. Edwards testified that she carries a rescue inhaler and that she had tried an alternative medication that was unsuccessful in ameliorating her asthma flare ups. The County does not provide sufficient reason to doubt that the jury weighed this evidence, applied the correct legal definition, and reasonably found that Edwards's asthma qualifies as a disability.

The County effectively asks us to impose a higher burden than what the ADA requires, demanding that Edwards show "severe" limitations or constant symptoms. Appellant Br. 18. That approach conflicts with the ADA and its implementing regulations, which make clear that a limitation need not be severe—only "substantial." *See, e.g.*, 29 C.F.R. § 1630.2(j)(1)(ii). Indeed, the implementing regulations explicitly reject a severity-based standard for disability. *See id.* ("An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."). These implementing regulations are consistent with the congressional rebuke—in the form of the ADAAA—of "years of court decisions" that applied restrictive and narrow standards in defining "who qualifies as an individual with disabilities . . . ." *Hostettler*, 895 F.3d at 848–49. And these regulations make clear that the relevant statutory text—"substantially limits"—requires "a degree of functional limitation that is lower than the standard . . . applied prior to the ADAAA." 29 C.F.R. § 1630.2(j)(1)(iv).

In sum, the jury reached a verdict that sufficiently aligns with both the statutory definition of disability and the evidence presented at trial. Given the highly deferential standard of review by which we are bound, the record does not warrant disturbing that verdict. We therefore affirm the judgment in favor of Edwards on her asthma-related failure-to-accommodate claim.

## III.

For the foregoing reasons, we **AFFIRM** the district court's entry of judgment on Edwards's disability-discrimination, retaliation, and failure-to-accommodate claims.